UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

DAVID LIN, MD,                          )
                                        )
     Plaintiff,                         )
                                        )
          v.                            )          Cause No. 4:21-CV-57-PPS
                                        )
FRANCISCAN ALLIANCE, INC. d/b/a         )
FRANCISCAN ST. ELIZABETH               )
HEALTH and FRANCISCAN                   )
ALLIANCE, INC. d/b/a FRANCISCAN         )
PHYSICIAN NETWORK,                     )
                                        )
     Defendants.

**<u>OPINION AND ORDER</u>**

Dr. David Lin, an infectious disease physician, alleges that he was harassed and discriminated against by his former employer because of his race and national origin, and then retaliated against for complaining about it. He has sued Franciscan St. Elizabeth Health and Franciscan Physician Network (collectively, "Franciscan") bringing several claims under both Title VII and Indiana state law. [*See* DE 7]. Franciscan now seeks summary judgment [DE 82] arguing, among other things, that it never took any materially adverse action against Lin (he voluntarily resigned) and that, in all events, there is no evidence that the things Lin complains about have anything to do with his race or national origin. I agree with Franciscan and will therefore grant Franciscan's motion on the federal claims and will relinquish supplemental jurisdiction over the state law claims.

## Factual Background

In September 2014, Franciscan hired Dr. Lin as an infectious disease physician and as the Medical Director of its Infection Control Department. [DE 7 at 4]; [DE 123-1, Ex. 225-1, Lin Dep. at 14:25-15:11]. Dr. Lin was credentialed at multiple Franciscan hospitals in central and western Indiana. [DE 134 at 2, Def's Reply to Add. Material Facts]; [DE 123-1, Ex. 225-1, Lin Dep. at 18:6-18:14]. In his role, Dr. Lin provided in-person care at two Franciscan Hospitals and telehealth care at three others. [DE 123-1, Ex. 225-1, Lin Dep. at 18:6-19:25]. At the time he was hired, Dr. Lin was the only physician who specialized in infectious diseases across all the Franciscan hospitals in central and western Indiana. [DE 7 at 4]; [DE 134 at 93, Def's Reply to Add. Material Facts]; [DE 93-23, Ex. 224, Lin. Decl.¶3].

Throughout Dr. Lin's employment with Franciscan, he regularly reported to Dr. Timothy Tanselle, Franciscan's Executive Medical Director for clinical and medical issues, and Dr. Daniel Wickert, the Vice President of Medical Affairs for Franciscan Health. [DE 125-2, Ex. 230, Tanselle Dep. at 26:15-28:6]; [DE 123-1, Ex. 225-1, Lin Dep. at 16:6-18:5]. Dr. Claude Foreit, a Franciscan Vice President and Dr. Al Tomchaney, Franciscan's Chief Medical Officer also had authority over Dr. Lin. [DE 134 at 3, Def's Reply to Add. Material Facts]; [DE 123-1, Ex. 225-1, Lin Dep. at 17:6-18:5].

Dr. Lin says that from the time he began working at Franciscan, he was "demeaned, bullied, and harassed" by Caucasian physicians. [DE 93-23, Ex. 224, Lin. Decl.¶9]. Dr. Lin says that for the first six months of his employment the all-white

2

orthopedic group from Unity Healthcare refused to work with him and instead referred patients to a Caucasian doctor not employed by Franciscan. [DE 7 at 5]; [DE 134 at 68, Def's Reply to Add. Material Facts]. Dr. Lin states that he once was criticized by a member of Unity's orthopedic group for not completing a consultation within four hours even though, at Franciscan, a physician is allowed 24 hours to complete a routine consultation. [DE 123-1, Ex. 225-1, Lin Dep. at 23:25-25:6, 31:1-32:3]; [DE 124-2, Ex. 227, Rookstool Dep. at 47:4-47:21]; [DE 125-1, Ex. 229, Foreit Dep. at 50:8-50:12]. The parties agree that Franciscan does not "employ" Unity's orthopedic group but disagree as to the degree of control Franciscan has over the orthopedic group. [DE 134 at 72, Def's Reply to Add. Material Facts].

Dr. Lin says that the harassment he faced while working at Franciscan began to accelerate in early 2020 at the height of the COVID-19 pandemic. [DE 7 at 5]. In early 2020, Dr. Lin suggested that Franciscan adopt a policy to allow N95 mask usage by Franciscan staff who had direct contact with COVID and suspected COVID-positive patients, and Dr. Lin told nurses and other staff members that N95 masks provided superior protection to surgical masks. [DE 93-23, Ex. 224, Lin Decl.¶¶15-27]. In February 2020, Franciscan rejected Dr. Lin's requests for N95 masks and eye shields for hospital personnel screening members of the public for admission to the hospital. [DE 7 at 5]; [DE 134 at 103, Def's Reply to Add. Material Facts]; [DE 93-23, Ex. 224, Lin Dec. ¶16]. Dr. Lin claims that he was yelled at for suggesting these precautions and later told to

"get on board" with advising the nursing staff that surgical masks were as safe as N95 masks. [DE 7 at 5].

Dr. Lin alleges in his complaint that his recommendations for N95 masks and other personal protective equipment (PPE) were refused because of his race. [DE 7 at 6]. Franciscan counters that Dr. Lin's recommendations were refused because there were N95 mask shortages and requiring staff to wear N95 masks was not in line with Franciscan's mask policy. [DE 83 at 3]; [DE 125-2, Ex. 230, Tanselle Dep at 30:5-30:21]. Dr. Lin was never disciplined for his position on N95 masks or for his related conversations and actions relating to the COVID-19 pandemic. [DE 134 at 27, Def's Reply to Add. Material Facts].

Throughout 2020 and 2021, Dr. Lin had several cases submitted to Franciscan's Medicine Standards Committee (MSC) for peer review. The MSC is a peer review committee, made up of about 8 to 10 members, which works to improve the quality of the hospital by reviewing the performance of physicians working at the hospital. Usually, a peer review involving the MSC begins when an individual submits a case to the MSC complaining about the performance of a physician. The MSC then reviews the record of the case, contacts the physician involved to hear their side, and then decides whether the physician met the standard of care in that instance. [DE 124-2, Ex. 227, Rookstool Dep at 21:12-22:19]. Prior to his resignation, the MSC reviewed the following individual cases belonging to Dr. Lin:

- A 2019 case of Dr. Lin's was reviewed by the MSC due to a physician request submitted by Dr. Douglas Rookstool. [DE 82-14 at 2, Rookstool Aff.]. The MSC reviewed and determined there was a deviation from the standard of care because there was a lack of antibiotics recommended at the time of the patient's discharge. [*Id.*] In March 2020, Dr. Lin was informed that he was found outside the standard of care by the MSC. [DE 90-17].

- A 2020 case of Dr. Lin's was reviewed by the MSC due to a committee referral regarding why treatment options were not discussed with the attending physician. The MSC found this case to be a predictable event within the standard of care and shared this with Dr. Lin on August 7, 2020. [DE 82-14 at 2, Rookstool Aff.]; [DE 82-14 at 47, Ex. C to Rookstool Aff.].

- A 2020 case of Dr. Lin's was reviewed by the MSC due to a physician request by Dr. Rookstool regarding MRSA management. The MSC found this to be a deviation from the standard of care and shared this with Dr. Lin on September 4, 2020. [DE 82-14 at 3, Rookstool Aff.]; [DE 82-14 at 49, Ex. D to Rookstool Aff.].

Dr. Lin had two additional individual cases reviewed by the MSC during 2021. [DE 82-14 at 4, Rookstool Aff.] However, the parties agree that the MSC's discussions and determinations following Dr. Lin's resignation in September 2021 are not relevant for purposes of summary judgment. [DE 134 at 45, Def's Reply to Add. Material Facts].

In addition to the individual cases listed above, Dr. Lin also had multiple batches of cases submitted to Dr. Rohit Modak of NorthGauge Healthcare Advisors and Dr. Erica Kaufman West of Franciscan Physician Network (FPN) for external peer review related to trends in his antibiotic treatment. Franciscan states that these cases were sent for external review because Dr. Lin was an infectious disease specialist and there was no other member of Franciscan's staff with that specialty. [DE 82-14 at 4-5, Rookstool

Aff.]; [DE 82-14 at 98, Ex. H to Rookstool Aff.]. Dr. Lin says that his cases were sent for external review to retaliate against him for complaining of discrimination. [DE 7 at 8-9]. The MSC sent the following batches of 10 cases for external peer review:

- In April 2020, the MSC decided to send ten (10) of Dr. Lin's cases for an outside peer review to review for trends related to antibiotic treatment. [DE 92-8 at 3, Ex. 122].

- In July and August 2020, the MSC reviewed the results of the external peer review of Dr. Lin's first 10 cases. The external reviewer, Dr. Modak, determined that 8 of the 10 cases deviated from the standard of care based on Infectious Diseases Society of America (IDSA) guidelines. Based on these results, the MSC decided to begin a Focused Professional Practice Evaluation ("FPPE") of this trend which involved sending 10 more cases for review to determine if Dr. Lin made any changes in his prescribing practice. [DE 82-14 at 5, Rookstool Aff.]; [DE 82-14 at 101-102, Ex. I to Rookstool Aff.]; [DE 82-14 at 109-110, Ex. J to Rookstool Aff.].

- In March 2021, the MSC proceeded with sending 10 additional cases related to Dr. Lin's prescribing practices for outside review as agreed upon in the July and August 2020 MSC meetings. Based on Dr. Lin's objections to the prior outside reviewer, Dr. Modak, the MSC sent the next 10 cases to a FPN Infectious Disease physician, Dr. Erica Kaufman West. [DE 134 at 55, Def's Reply to Add. Material Facts]. Dr. Kaufman West's report revealed that in seven out of the ten cases she reviewed Dr. Lin's care deviated from the standard of care. [DE 82-13, Wickert Aff., ¶ 38]; [DE 82-13 at 216-243, Exhibit Q to Wickert Aff. at FPN_0012536 – FPN_0012563]. In its April 2021 meeting, the MSC decided to send 10 more cases for outside review. [DE 82-14 at ¶ 24, Rookstool Aff.]; [DE 82-14 at 174-175, Ex. S to Rookstool Aff.].

- In August 2021, 10 more of Dr. Lin's cases were sent to Dr. Modak for review. Dr. Modak completed this review on September 16, 2021, and determined that in all ten cases Dr. Lin's treatment met the standard of care. [DE 82-13, Wickert Aff., ¶ 39]; [DE 82-13 at 245-280, Exhibit R to Wickert Aff. at FPN_0012475 – FPN_0012510].

Throughout the peer review process described above, Dr. Lin makes several complaints to Franciscan's HR department complaining about the behavior of several different doctors including Dr. Eben True, Dr. Michael Bohlin, Dr. Wickert, and Dr. Rookstool, who chaired the MSC. [*See* DE 90-5; DE 93-4, DE 93-21, DE 93-22, DE 94; DE 95; DE 96; DE 97; DE 98; DE 102; DE 113]. These complaints do not mention racial discrimination, and it is not until July 2020 when Dr. Lin sends a letter to Franciscan's HR department that he complains of racial discrimination. [*See* DE 90-7].

In April 2021, following Dr. Kaufman West's external peer review, the MSC requested Dr. Lin complete ten hours of continuing medical education (CME) related to antibiotic stewardship. [DE 82-14 at ¶ 24, Rookstool Aff.]; [DE 134 at 57, Def's Reply to Add. Material Facts]. After a drawn-out back and forth between Dr. Lin and the MSC, where Dr. Lin disputed the results of the peer reviews as well as the recommendation that he complete additional CME hours, Dr. Lin attended the August 2021 Medical Executive Committee (MEC) meeting to discuss the concerns identified in relation to his antibiotic prescribing. Both parties acknowledge that Dr. Rookstool testified the MEC took a vote to suspend Dr. Lin, but dispute whether a vote actually took place. [DE 134 at 62, Def's Reply to Add. Material Facts]; [DE 124-2, Ex. 227, Rookstool Dep. at 209:2-209:19]. Dr. Lin was never suspended because of the August 2021 MEC meeting and the MEC took no action against his hospital privileges, license, or employment as a result of the meeting. [DE 82-15, Shah Aff., ¶ 10].

In January 2021, Dr. Lin filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). [DE 7-1; DE 7-2]. In May 2021, the EEOC issued Dr. Lin a Dismissal and Notice of Rights. [DE 7-3; DE 7-4]. In August 2021, Dr. Lin filed the complaint in this case. [*See* DE 1]. In September 2021, Dr. Lin resigned from his position at Franciscan. [DE 91-12, Ex. 63]; [DE 91-13, Ex. 64].

### Motions to Strike

The parties have filed dueling motions to strike neither of which has any merit. Let's start with Franciscan's. In their Reply in Support of their Motion for Summary Judgment, Franciscan moves to strike the following exhibits from Dr. Lin's designation of evidence: Exs. 8-14, 16-23, 26, 39, 42, 48, 52- 54, 56- 57, 60, 63-64, 69, 76, 79-81, 85-86, 96, 102-103, 108-109, 115, 121-126, 128-129, 130, 132, 133, 136, 140, 159, 161, 200, 206- 218, 220- 223, and 237. [DE 133 at 3]. Franciscan argues that Dr. Lin has failed to lay the foundation for these documents and communications and neglected to authenticate them or cite to authentication testimony. [*Id*. at 2].

Because Franciscan's motion to strike was improperly raised in its reply brief, I gave Dr. Lin an opportunity to file a surreply. In it, Dr. Lin points to a declaration and supplemental declaration of counsel which attests under penalty of perjury that each of the referenced exhibits Franciscan seeks to strike based on lack of authenticity was produced by Franciscan during discovery. [DE 145 at 2]; [*See* DE 93-18, Endwright Decl.; DE 145-1, Suppl. Decl. Endwright]. Franciscan does not dispute this. I therefore have no reason to doubt the authenticity of the documents. *PrimePay, LLC v. OneSource*

*Virtual, Inc.*, 2023 WL 5175496, at *14 (N.D. Ind. Aug. 11, 2023) ("There is no requirement that documents submitted to oppose summary judgment be fully authenticated, provided these documents can be authenticated and rendered admissible at trial and provided there is no common sense or compelling reason for the court to doubt their authenticity at summary judgment.").

I can consider unauthenticated documents at the summary judgment stage if it appears they are capable of authentication at trial. *Duis v. Franciscan All., Inc.*, 2022 WL 3017321, at *1 (N.D. Ind. July 29, 2022). *See also*, *Boyce v. Wexford Health Sources, Inc.*, 2017 WL 1436963, at *3 (N.D. Ill. Apr. 24, 2017) ("federal courts routinely consider unauthenticated documents on motions for summary judgment . . . when it is apparent that such documents are capable of reduction to admissible, authenticated form"). Based upon a review of the exhibits at issue, it appears they can easily be authenticated at trial. As such, Franciscan's motion to strike is **DENIED**.

Dr. Lin also filed a motion to strike seeking to exclude additional facts that Franciscan included in its reply brief. [DE 145 at 14]; [DE 134 at 152-156]. This is a curious filing since Dr. Lin was given the opportunity to file a surreply to address these additional facts and did address them in the surreply. [*See* DE 145]. That part of the motion will therefore be **DENIED**.

Dr. Lin also seeks to strike Franciscan's manually filed audio recording [DE 145 at 14-15] because it was received three days after the deadline and should be struck as untimely. [*Id*. at 15 n.6]. But the manual filing was sent through the mail and a delay

related to the delivery of mail to the clerk's office is excusable. *See* Fed. R. Civ. P 6(b)(1); *Pearson v. Gatto*, 933 F.2d 521, 524 (7th Cir. 1991) (explaining that uncontrollable delays in the delivery of mail serve as grounds for excusable neglect). Plaintiff also argues that Franciscan wishes to use the manually filed audio recording as improper character evidence. [DE 145 at 14-15]. However, Franciscan asserts the recordings are not being used as improper character evidence and are being used only as evidence regarding what occurred during certain meetings. [DE 147 at 8 n.2]. The court will only consider the recordings as evidence regarding what occurred during the pertinent meetings, and for this purpose, the recordings are admissible. *See e.g., United States v. Obiuwevbi*, 962 F.2d 1236, 1240 (7th Cir. 1992) (explaining that evidence tending to show character is admissible if used to prove some other fact at issue in a case and if the evidence's potential for unfair prejudice does not substantially outweigh its legitimate probative value).

In sum, this case provides a paradigmatic example of why motions to strike are disfavored. *See Mace v. Ray*, 2022 WL 2644118, at *2 (N.D. Ind. July 8, 2022) (explaining that motions to strike are typically disfavored and usually only granted in circumstances where the contested evidence causes prejudice to the moving party); *Young v. Obaisi*, 2019 WL 1239876, at *1 n.1 (N.D. Ill. Mar. 18, 2019) (same). For the reasons stated above, both parties' motions are **DENIED**.

### Motion for Summary Judgment

In his amended complaint, Dr. Lin alleges that Franciscan has engaged in national origin and race discrimination and created a hostile work environment in violation of Title VII (Count I). [DE 7 at 10]. Dr Lin also alleges that Franciscan has engaged in retaliation in violation of Title VII (Count II). [*Id*. at 11]. Franciscan has moved for summary judgment on each of these claims.

Summary judgment is proper if there are no genuine issues as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 567 (7th Cir. 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986). On a motion for summary judgment, all facts and reasonable inferences are construed in a light most favorable to the non-moving party. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

### A.  Hostile Work Environment Claim

I'll begin by analyzing Dr. Lin's Hostile Work Environment Claim. Title VII prohibits an employer from creating a hostile work environment. *Cooper-Schut v. Visteon*

11

*Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). To survive summary judgment on his hostile work environment claim, Dr. Lin must provide sufficient evidence from which a reasonable jury could find: (1) he faced harassment that was both subjectively and objectively offensive; (2) the harassment was because of his Taiwanese national origin and/or Asian race; (3) the harassment was severe or pervasive; and (4) the harassment can be imputed to Franciscan. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017).

As to the third element—whether the harassment was severe or pervasive—there must be evidence that the workplace was so permeated with "discriminatory intimidation, ridicule, and insult," that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). This requires judges to look at (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022).

The allegedly harassing conduct in this case does not come close to establishing that the harassment was severe or pervasive, objectively offensive, or—if it existed at all—that it had anything whatsoever to do with Dr. Lin's race or national origin. Starting with his interactions with the orthopedic group, Dr. Lin states that almost as

12

soon as he started working at Franciscan, he "experienced a lot of bullying, abusive, and discriminatory behavior" from an all-Caucasian orthopedic group, such as "constantly complain[ing] about his work," and "loud" and "false criticisms" of his work. [DE 119 at 3]; [DE 123-1, Ex. 225-1, Lin Dep. at 23:25-25:6]. I have long thoughts on whether these subjective conclusions of Dr. Lin can meet the high standard of being "objectively offensive" or "severe." But in any event, Dr. Lin points to no evidence in the record which shows that the actions of the orthopedic group were *because of his race or national origin*. While Dr. Lin may have found the alleged actions of the orthopedic group rude or disrespectful, that alone is not enough for a reasonable jury to conclude that Title VII was violated. *Roderick v. BRC Rubber & Plastics, Inc.*, 796 F. App'x 309, 311 (7th Cir. 2020) ("a hostile work environment is unlawful under Title VII only when the plaintiff is singled out based on a protected characteristic"); *Geng v. Del Toro*, 2021 WL 6102171, at *3 (7th Cir. Dec. 23, 2021) (explaining that to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that the harassment was based on membership in a protected class); *Jordan v. R & O Aurora Inc.*, No. 07-C-06452, 2008 WL 5387709, at *4 (N.D. Ill. Dec. 22, 2008) ("Merely offensive conduct does not give rise to liability, for Title VII is not a civility code."); *Xieyu Zhao v. Brink's, Inc.*, 2007 WL 9736087, at *7 (C.D. Ill. Jan. 29, 2007) ("As long as the hostility was not based on a protected characteristic, Title VII is not implicated."); *Pubentz v. Holder*, 2013 WL 812377, at *10 (N.D. Ill. Mar. 5, 2013) (explaining that the conduct must have a racial character or purpose to support a hostile work environment claim).

To show that the orthopedic group's actions were racially motivated Dr. Lin provides an example of a Native American patient he referred to the orthopedic group who was later refused a consultation. Lin concludes this "was either because . . . of his Native American heritage and they didn't want to participate in his care, or it was because of me and my Asian American heritage that they felt they didn't need to take my consultation seriously." [DE 123-1, Ex. 225-1, Lin Dep. at 32:10-33:22, DE 123-1]. Dr. Lin's example works against his conclusion that the orthopedic group treated him differently because of his race. Dr. Lin admits that he isn't sure if the behavior he perceives as hostile is due to his race or national origin but, without evidence, concludes that there must be racial discrimination somewhere. Dr. Lin also says that he believes Dr. Bauman's refusal of his "routine consultation" was racial discrimination because "[t]here is no reason for a physician not to take such a routine referral." [DE 123-1, Ex. 225-1, Lin Dep. at 42:6-42:15]. Dr. Lin's personal beliefs regarding the orthopedic group's actions, standing alone, are too saturated with subjectivity to support a Title VII claim. *See e.g.*, *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005) (explaining that conduct that is not severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive is beyond Title VII's purview); *Parker v. City of Chicago*, 1996 WL 41204, at *5 (N.D. Ill. Jan. 30, 1996) (explaining that the presence or absence of discrimination in the Title VII context does not hinge on the subjective feelings of an employee).

14

Dr. Lin also states that he faced demeaning and harassing treatment in early 2020 at the height of the COVID-19 pandemic. Dr. Lin says that he "advocated for providing N95s to all suspected and confirmed COVID cases, and for anyone who was at risk for exposure given their exposure to the public at large." [DE 93-23, Ex. 224, Lin Decl.¶17]. The evidence in the record shows that Franciscan had legitimate reasons to refuse Dr. Lin's recommendations: Franciscan was justifiably concerned with its N95 mask supply, Dr. Lin's recommendations were outside of Franciscan's mask policy, and Dr. Lin was raising a hysteria by telling people they could die if they didn't wear N95 masks. [DE 82-7, Lafayette East Dep. at 133:20–134:20]; [DE 82-8, Wickert Dep. at 85:8-88:2]. Things came to a head in March 2020 when Dr. Lin was approached by Dr. Daniel Wickert, Dr. Samir Shah, and Dr. Nathan Huber about his comments regarding N95 masks and his statements to staff about the effectiveness of the masks. [DE 82-8 at 41, Ex. 102 to Wickert Dep.]; [DE 126-1, Ex. 232 Shah Dep. at 47:15-53:14]. Dr. Lin also says that Michael Bayci, a Safety Officer at Franciscan, yelled at him during a group call when Dr. Lin insisted N95s were necessary. [DE 123-2, Ex. 225-2, Lin Dep. at 118:22-119:22].

I'm dubious whether these interactions could be considered objectively offensive and whether a reasonable juror could find them to be severe or pervasive. At the onset and throughout the COVID-19 crisis, there was reasonable disagreement on masking policy and this disagreement appears to have played out in the halls of Franciscan. To turn those disagreements into an actionable Title VII workplace harassment claim strikes me as a stretch. But in all events, once again, none of the indignities that Dr. Lin

15

may have suffered, justified or not, have anything to do with Dr. Lin's race or national origin. Indeed, Dr. Lin admitted as much at his deposition; yet he inferred they must have been motivated by invidious discrimination because he "did not observe Mr. Bayci yell at any Caucasian employees at Franciscan." [DE 134 at 22, Def's Reply to Add. Material Facts]; [DE 123-2, Ex. 225-2, Lin Dep. at 119:9-119:12]. But as explained above, this type of subjective conclusion is not enough to stave off summary judgment.

Simply put, Dr. Lin points to no evidence in the record showing that he was harassed at work in relation to his suggestions regarding N95 masks and COVID-19 precautions *because of his race or national origin*. Dr. Lin's amended complaint states "[b]ecause COVID-19 is believed to have originated in China, Dr. Lin believes his closely related Taiwanese heritage and Asian national origin motivated Franciscan to view his recommendations as suspect." [DE 7 at 6]. But that is an allegation unsupported by evidence. And to repeat: Dr. Lin's personal subjective beliefs are not enough to support a hostile work environment claim. *Rizzo v. Sheahan*, 266 F.3d 705, 712 (7th Cir. 2001) (explaining that a work environment cannot be described as "hostile" for purposes of Title VII unless a reasonable person would find it offensive); *Washington v. Int'l Surv. Rsch., LLC*, 2005 WL 1162965, at *5 (N.D. Ill. May 16, 2005) (explaining that a plaintiff's subjective belief that comments and conduct constitute a racially hostile work environment cannot serve as the sole basis of his claim); *Collins v. Buechel Stone Corp.*, 390 F. Supp. 2d 810, 815 n.2 (E.D. Wis. 2005) (explaining that a plaintiff's belief that harassment was racially motivated is insufficient to support a Title VII claim.").

16

Dr. Lin also claims that harassment he faced from Dr. Douglas Rookstool, Franciscan's MSC chair, contributed to a hostile work environment. Dr. Lin states "although Rookstool has no specialty in infectious diseases, he frequently and openly denigrated [his] patient care and expressed contempt at [his] statements during meetings." [DE 119 at 4]. Dr. Lin says that rather than following his recommendations, Dr. Rookstool—more than once—changed his recommendations and "overstepped [his] responsibility" and was never held accountable for this conduct. [*Id.*] Dr. Rookstool stated that he had probably disagreed with Dr. Lin's treatment recommendations only three or four times. [DE 82-10, Rookstool Dep. 49:16-49:20]. Out of those three or four disagreements, Dr. Rookstool sent two cases to the MSC regarding Dr. Lin's care, and the parties agree that Dr. Rookstool also sent two cases in the external peer review to Dr. Modak. [DE 134 at 38, Def's Reply to Add. Material Facts]. Sending four of Dr. Lin's cases to peer review, absent any evidence the cases were sent because of his race, is not enough to constitute a hostile work environment. The parties agree that Dr. Rookstool has had disagreements regarding patient care with other physicians, including Caucasian physicians, and has referred those physicians for peer review. [DE 134 at 39, Def's Reply to Add. Material Facts]. Importantly, Dr. Lin admits that he does not recall Dr. Rookstool ever making any comments about his national origin or race. [DE 123-1, Ex. 225-1, Lin Dep. at 88:12-88:15]. Dr. Lin has pointed to no evidence that Dr. Rookstool questioned his recommendations because of his race or national origin.

Dr. Lin also complains of harassment from Dr. Eben True, a general surgeon. According to Dr. Lin, Dr. True discriminated against him on the basis of his race and national origin because he yelled, and his answers were frequently "curt", "he seemed hostile", and "I detected a tone." [DE 123-1, Ex. 225-1, Lin Dep. at 88:16 – 88:25, 99:10-99:23]. These are trifles and conclusory ones at that. Dr. Lin testified that because Dr. True was nice to Caucasian physicians, he concluded that his behavior was because of his race and national origin, stating "[b]ecause I never saw him behave this way toward any Caucasian male physician or Caucasian staff member . . . I'm drawing the conclusion that it was my race or national origin." [DE 123-1, Lin Dep. 99:24-100:9]. Dr. Lin again presents no evidence, outside of his own beliefs, that the hostilities he alleges he faced were because of his race or national origin. Once again, this is not enough for a reasonable jury to conclude that Dr. Lin faced a hostile work environment. *Manson v. Gen. Motors Corp.*, 66 F. App'x 28, 33 (7th Cir. 2003) ("Federal civil rights laws do not guarantee a utopian workplace, or even a pleasant one.").

Dr. Lin also takes issue with Franciscan's peer review process. Dr. Lin states that the purpose of Franciscan's peer review process was to harass him and discriminate against him. [DE 119 at 4-6]; [DE 134 at 31, Def's Reply to Add. Material Facts]. Dr. Lin's assertion that the purpose of the peer review process was to harass him is contradicted by the evidence in the record. Franciscan has pointed to multiple pieces of evidence showing an honest and legitimate reason for subjecting Dr. Lin to peer reviews. Dr. Wickert, Franciscan's Vice President of Medical Affairs, stated in his

18

affidavit that "[t]he Peer Review Procedure is commonly invoked to ensure physicians are providing the best possible care to patients." [DE 82-13, Ex. 13, Wickert Aff. at ¶ 18]. Indeed, Dr. Lin's Physician Employment Agreement explains that he will be subjected to peer review. Section 1.9 of the Physician Employment Agreement is titled "Limited Waiver of Peer Review Confidentiality" and explains "[i]t is the intent of the Hospital and FPN to exchange confidential peer review information pertinent to Physician." [DE 126-5 at 5]. Dr. Lin's Employment Agreement explains "[t]he purpose of this exchange is to foster more effective peer review and ultimately improve the quality of care provided by Hospital and FPN." [*Id.*]

The evidence in the record shows that Dr. Lin was subjected to peer reviews because of legitimate concerns related to his performance as a physician. Dr. Lin obviously disagrees with whether those peer reviews were justified. This strikes me as an honest disagreement. But at the risk of sounding like a broken record, this is not an actionable Title VII harassment claim. There is no evidence that the disagreement was borne out of an animus towards Dr. Lin because of his race or national origin. Dr. Lin admits that numerous doctors and Franciscan staff members he believes acted rudely towards him and contributed to a hostile work environment never mentioned his race or nationality. Dr. Lin states that Mr. Bayci and Dr. Huber never mentioned his race or nationality and he has no knowledge anything about his race or nationality was said to anyone else. [DE 123-2, Ex. 225-2, Lin Dep at 120:3-120:12]. Dr. Lin also states that Dr. Wickert never made any comments to him about his race or national origin, and he has

19

no knowledge that he was ever insulted about those things behind his back. [DE 123-2, Ex. 225-2, Lin Dep at 124:18-124:23]. In sum, even assuming that Dr. Lin was subjected to severe or pervasive harassment that was both subjectively and objectively offensive, the absence of evidence that it had anything to do with Dr. Lin's race or national origin makes this claim a complete nonstarter.

### B. National Origin and Race Discrimination Claim

Dr. Lin also asserts that Franciscan has engaged in national origin and racial discrimination in violation of Title VII. Title VII makes it unlawful for an employer to refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018); 42 U.S.C. §2000e-2(a)(1)). To survive summary judgment on his Title VII discrimination claim, Dr. Lin must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the adverse employment action." *Barbera*, 906 F.3d at 628 (quoting *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017)).

Evaluating discrimination claims using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) remains an efficient way to organize, present, and assess evidence related to claims of discrimination. But it's not the only way to analyze a discrimination case. As the Seventh Circuit explained in *Ortiz v. Werner*

*Enterprises, Inc.*, 834 F.3d 760 (2016), courts may take a holistic approach and simply view all of the evidence, direct and circumstantial, place it into a pile and ask whether a reasonable juror could conclude based on all of the evidence that discrimination was afoot. *Id*. In a recent concurrence, Justice Thomas suggested the same thing. *Ames v. Ohio Dep't of Youth Servs.*, No. 23-1039, 2025 WL 1583264, at *6 (U.S. June 5, 2025). Nevertheless, the parties in this case have hewed closely to the *McDonnell Douglas* framework, and I will do so as well.

Under *McDonnell Douglas*, a plaintiff must make a prima facie case by showing (1) they are members of a protected class; (2) performed reasonably on the job in accord with their employer's legitimate expectations; (3) were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *David v. Board of Trustees of Community College Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff makes out a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action, at which point the burden shifts back to the plaintiff to present evidence that the employer's explanation is a pretext. *Id.* As alluded to in *Ortiz* and by Justice Thomas in his *Ames* concurrence, there is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's protected status. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894-95 (7th Cir. 2018).

21

Dr. Lin is Taiwanese and thus a member of a protected class. But this first requirement of the *McDonell Douglas* test is now a throwaway. *Everyone* is protected by laws prohibiting unlawful discrimination. So held the Supreme Court earlier this month. *See Ames*, 2025 WL 1583264. The focus for Title VII, as the statute makes clear, is whether an *individual* was subjected to unlawful discrimination irrespective of what group that individual may belong to. *Id*. at *4.  It's plain therefore that Dr. Lin, just like everyone else, is entitled to protection from unlawful discrimination under Title VII.

But the problem with Dr. Lin's case is that he has no evidence that he was subjected to an adverse employment action. Recall that Dr. Lin voluntarily resigned from Franciscan. So, he can't even get to first base in his claims of unlawful discrimination. But what's more, even if he was subjected to an adverse action, as I noted repeatedly above, there is nothing that shows it was because of his race or national origin.

Not everything that makes an employee unhappy is an actionable adverse action. *Chicago Tchrs. Union, Loc. 1 v. Bd. of Educ. of City of Chicago*, 419 F. Supp. 3d 1038, 1046 (N.D. Ill. 2020) (quoting *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)). An adverse employment action is typically "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Chicago Tchrs. Union, Loc. 1*, 419 F. Supp. 3d at 1046. *See also*, *Sweeney v. West*, 149 F.3d 550, 556

(7th Cir. 1998) (explaining that discrimination under Title VII does not include instances of differential treatment that have little or no effect on an employee's job).

Dr. Lin says that he experienced discrimination in early 2020 during the start of the COVID-19 pandemic when Franciscan denied his recommendations regarding PPE. But as explained above, the parties agree that Dr. Lin was never disciplined for his position on N95 masks or for his related conversations and actions relating to the COVID-19 pandemic. [DE 134 at 26-27, Def's Reply to Add. Material Facts]. Thus, there was no violation of Title VII in relation to Dr. Lin's PPE recommendations. *Kulcsar v. AutoZone, LLC*, 2017 WL 1364135, at *5 (N.D. Ind. Feb. 24, 2017) ("An essential element of every Title VII employment discrimination claim is a materially adverse employment action."); *Denson v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 2002 WL 15710, at *11 (N.D. Ill. Jan. 4, 2002) ("There is no cognizable Title VII claim unless plaintiff suffered an adverse employment action.).

Part of Dr. Lin's claim that he was discriminated against based on his race and national origin relates to the fact that he was subjected to internal and external peer reviews. Dr. Lin's complaint mentions that for over 5 years no one found that he provided substandard patient care, but he was found "outside of the standard of care" in 3 or 4 instances beginning around April 2020. [DE 7 at 7]. Dr. Lin also says that in 2020 "for the first time in his career" his patient files were sent to an external peer reviewer. [*Id.*]

23

Let's suppose that a peer review could be considered an adverse employment action under Title VII. Nevertheless, as discussed above, Franciscan has provided evidence of a nondiscriminatory reason for the peer reviews. And Dr. Lin has no evidence that their reason is a pretext. A pretext is a lie; it is a phony explanation for an action taken to mask discriminatory motives. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006). And there is simply no evidence suggesting that Franciscan was lying to mask its discriminatory motives when they decided to subject Dr. Lin to peer reviews. Dr. Lin attempts to show pretext by arguing that of the cases reviewed by the MSC, "minority physicians' cases were approximately double the number of Caucasian physicians' cases." [DE 145 at 10]. Franciscan does not dispute that the number of minority physician cases reviewed are higher but points to evidence that more minority physician cases were reviewed because most of the physicians credentialed at Lafayette East who were subject to oversight by the MSC during 2020 and 2021 were minorities. [DE 135-10 at ¶19, Wickert Sec. Aff.]. Franciscan also points to evidence that from 2014 through 2023, 71 different physicians, with 20 different races and nationalities, had cases reviewed by the MSC. [DE 82-13 at ¶22, Wickert Aff.; DE 82-13 at 285-299, Ex. S to Wickert Aff.]. The parties also agree that Dr. Rookstool, the MSC chair, has had disagreements regarding patient care with other physicians, including Caucasian physicians, and have referred those physicians for peer review. [DE 134 at 39, Def's Reply to Add. Material Facts].

While it is certainly relevant that more minority physicians have had cases sent out for peer review than non-minority physicians, simply asserting that fact without pointing to any evidence showing that Franciscan's proffered reasons are illegitimate is insufficient to show pretext. *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009) (explaining that to show pretext, a plaintiff is required to show that the employer's stated reason for an employment action is dishonest and that the true reason was based on discriminatory intent).

Finally, Dr. Lin argues that he faced discrimination in violation of Title VII because he was pushed out of his job and forced to resign. [DE 7 at 9]. This is another way of saying that Dr. Lin was subjected to a constructive discharge.  A constructive discharge can amount to an adverse employment action under Title VII. *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1043 (7th Cir. 2023). A constructive discharge occurs when someone's working conditions are so "unbearable" that they had no choice but to resign. *Id., citing Chapin v. For-Rohr Motors, Inc.* 621 F.3d 673, 679 (7th Cir. 2010). To prove this, a plaintiff must show that their working conditions were "even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress." *Id*. Dr. Lin voluntarily resigned from Franciscan in September 2021. [*See* DE 91-12; DE 91-13]. And there is no evidence that he did so because his work conditions were "unbearable."

Dr. Lin quit his job in September 2021 before his peer reviews were completed and now argues, absent evidence, that he was forced out due to racial discrimination.

25

Dr. Lin says that he believed that if he didn't resign the MEC was going to attack his license. [DE 123-2, Ex. 225-2, Lin Dep at 165:15-165:23]. However, Dr. Lin admits that he never saw any written communication from Franciscan saying that he was being forced to resign and never talked with anyone at Franciscan regarding his resignation or why it was occurring. [DE 123-2, Ex. 225-2, Lin Dep at 165:24-166:12]. Dr. Lin insists that he knew his license would be attacked because he was looked at with contempt and that "it was obvious from their behavior that this was what was going to [] ensue." [DE 123-2, Ex. 225-2, Lin Dep at 196:19-197:1]. However, Dr. Lin acknowledged that the separation agreement he signed with Franciscan explicitly stated, "at the time of this agreement, physician is not under investigation by the medical staff of hospital and it's our position that a report to the National Practitioner Data Bank is not required." [*Id*. at 198:3-198:9]. Dr. Lin also acknowledged that his separation agreement stated, "physician is currently in good standing." [*Id*. at 198:10-198:12]. Dr. Lin acknowledges that he signed a document voluntarily resigning his position at Franciscan. [*Id*. at 198:14-199:8]. And indeed, the parties agree that Franciscan never took any action against Dr. Lin's license to practice medicine or his credentials at Lafayette East. [DE 134 at 65-66, Def's Reply to Add. Material Facts].

In sum, based upon the evidence submitted in support of and in opposition to Franciscan's motion for summary judgment, it is clear to me that there is no way for a reasonable jury to conclude that Dr. Lin faced discrimination in violation of Title VII. The record in this case is devoid of any evidence that Dr. Lin was subjected to an

adverse employment action. What's more, even if some of the actions taken against him could be considered adverse employment actions under Title VII, there is simply no evidence it was because of his race, national origin, or any other status protected under Title VII.

### C. Retaliation Claim

Dr. Lin also asserts a Title VII retaliation claim. Under Title VII, it is unlawful for an employer to retaliate against an employee because he or she opposes an employment practice proscribed by Title VII or because he or she participates in an investigation or proceeding under Title VII. *See* 42 U.S.C. § 2000e-3(a); *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 633 (7th Cir. 2022). To survive summary judgment on his retaliation claim, Dr. Lin must provide evidence that (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Jokich*, 42 F.4th at 633.

To make his case for retaliation, Dr. Lin states that he submitted several complaints about discrimination and harassment to Franciscan's HR department between June 2020 and September 2020 and filed a Charge of Discrimination with the EEOC in January 2021. [DE 7 at 11; DE 119 at 20-21]. Dr. Lin says that after he complained to Franciscan's HR department, he had an additional 10 patient cases sent for external review by the Medicine Standards Committee. [DE 7 at 9]. Dr. Lin also states that Dr. Rookstool's discriminatory behavior intensified after his complaints to HR and that Rookstool picked his peer review cases that went for external review,

refused to provide him with flexibility during meetings, provided negative updates to the MEC, and eventually referred him to the MEC. [DE 119 at 22-23].

I'll begin by examining the details of each of Dr. Lin's complaints to see if they were protected by Title VII, meaning they were complaints of discrimination based on race or national origin.  Most of them were not. Let's start with the complaint Dr. Lin filed in March 2020. In that complaint, Dr. Lin stated the following: "I feel Dr. Rookstool is using his position to bully me and intimidate me out of a personal grievance for not obeying his dictates and instead following my clinical judgment in the original case." [DE 94]. In July 2020, Dr. Lin submitted multiple complaints to Franciscan and in each he mentions professional disagreements with Dr. Rookstool and complain of Dr. Rookstool's "extremely disrespectful tone" and state that he was "intentionally disparaging" to Dr. Lin's medical opinion. However, none of these reports explicitly claim discrimination based on race. [*See* DE 90-5; DE 95; DE 96; DE 97].

In September 2020, Dr. Lin submitted another complaint wherein he stated that his clinic manager (Dr. Bohlin) complained about him refusing hospitalist consultations. [DE 93-21]. This again does not mention differential treatment based on race or national orientation. In August 2020, Dr. Lin submitted an incident report complaining that "Dr. Rookstool used demeaning language in an open interaction with me." [DE 93-22]. Dr. Lin also states "[t]his is not the first time that I have been subjected to demeaning and harassing behavior from Dr. Rookstool." [*Id.*] Once again, these complaints make no mention of discrimination or harassment related to Dr. Lin's race or national origin.

None of these complaints classify as protected activity under Title VII. *Turner v. Nice-Pak Prods., Inc.*, 2017 WL 119393, at *11 (S.D. Ind. Jan. 12, 2017) ("It is well-established under Seventh Circuit law that general complaints unconnected to a protected class are insufficient to support a Title VII retaliation claim."); *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) ("To constitute protected expression, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class."); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (same).

However, Dr. Lin did engage in activity protected by Title VII when, in July 2020, he complained of racial discrimination to Franciscan's HR department. [DE 90-7]. In that letter, Dr. Lin complains of his treatment in relation to the MSC peer reviews and COVID-19 PPE and specifically complained of "workplace harassment and discrimination because of my national origin and race." [*Id.* at 2]. Thereafter, in January 2021, Dr. Lin filed a charge of discrimination with the EEOC. Dr. Lin's July 2020 letter and his claims of discrimination filed with the EEOC are certainly protected activity under Title VII. *See e.g.*, *McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir. 2022) ("To be sure filing a charge with the EEOC about the alleged discrimination is the most obvious form of statutorily protected activity."); *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) (explaining that a complaint of discrimination is a protected activity under Title VII when the discrimination is based on a protected characteristic such as race).

For Dr. Lin to demonstrate that he has a retaliation claim which survives summary judgment, he must point to evidence that he suffered an adverse employment action. In the Title VII retaliation context, an "adverse employment action" has taken place when an employer's action is one that would dissuade a reasonable worker from participating in protected activity. *Lesiv v. Illinois Central Railroad Company*, 39 F.4th 903, 912 (7th Cir. 2022). This is an easier standard to satisfy than the "adverse employment action" element of a discrimination claim. *Id.* This is because the statutory language in the antiretaliation section of Title VII differs from the language in the antidiscrimination portion of the statute. So held the Supreme Court in *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 63-64 (2006).

Dr. Lin focuses his retaliation claim on actions he alleges Dr. Rookstool took following his complaints of discrimination in July of 2020 (the internal complaint) and January 2021 (the EEOC complaint). More specifically, that Dr. Rookstool decided that his cases before the MSC should be sent for external review. [DE 119 at 22]. Even assuming that external peer reviews constitute an adverse employment action, which I doubt considering Dr. Lin's employment agreement puts him on notice that he would be subjected to peer review as part of his job, his claim of retaliation suffers from a fatal flaw: there is insufficient evidence of a causal link between the protected activity and the adverse employment action.

Dr. Lin says that the reason his cases were sent to an external reviewer were in retaliation for his complaints about racial discrimination, but there is no evidence in the

30

record suggesting this. The evidence in the record shows that the decision to begin

sending Dr. Lin's cases for external review was made in April and May 2020—*prior* to

his complaints of discrimination in July of that year.  It was done because the MSC

wished to evaluate Dr. Lin's cases for trends related to his approach to antibiotics. The

MSC meeting minutes from May 1, 2020 state:

> The Committee discussed the infectious disease approach to the antibiotic
> selection in this patient . . . [t]he Committee agreed additional case review
> by an outside reviewer related to infectious disease approach…is needed .
> . . [t]he Committee Chair will select ten (10) cases for outside review. . .

[DE 82-14 at 35].

It is true that Dr. Lin did have additional cases sent out for review

following his HR complaints of discrimination in July 2020. But the evidence in

the record shows that sending 10 more random cases was simply a continuation

of a review for trends in Dr. Lin's approach to prescribing antibiotics. [*See* DE 93-

17, Ex. 218]. The fact that additional cases were sent for external review following

his complaints to HR, standing alone, is not enough for a reasonable jury to

determine there was retaliation in violation of Title VII. *Johnson v. Nordstrom, Inc.*,

260 F.3d 727, 735 (7th Cir. 2001) (explaining that when the same actions are taken

both before and after an individual files a complaint, the actions cannot be seen

as retaliatory conduct). And to repeat, temporal proximity between the protected

activity and the adverse action is insufficient by itself to withstand summary

judgment. *See Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 751 (7th Cir. 2009)

(collecting cases).

Dr. Lin argues that following his complaints, Dr. Rookstool's behavior

"intensified", and he guided Lin's peer reviews before the MSC. [DE 119 at 21]. Dr. Lin

makes no connection between Dr. Rookstool's actions as a member of the MSC and his

complaints to HR or the EEOC. As recognized by Lin, Dr. Rookstool was the Chair of

the MSC. [DE 119 at 4]. In a sworn affidavit, Dr. Rookstool states that he has served on

the MSC since 2011 and held the chair position during 2020 and 2021. [DE 82-14 at 1,

Rookstool Aff.]. To the extent Lin argues that Rookstool's behavior "intensified" he

points to no evidence connecting this to his complaints to HR or the EEOC. The

evidence in the record shows that the members of the MSC were part of the MSC before

Dr. Lin complained and continued to operate as they had before Dr. Lin complained to

HR. The decision to select 10 random cases of Dr. Lin's for outside review was

connected to a determination to review Dr. Lin's cases for trends related to his antibiotic

treatment. [*See* DE 93-17, Ex. 218]. The alternative explanations provided by Franciscan

for why Dr. Lin's cases were sent for external review weakens the causal link between

Lin's HR complaints and his cases being sent for external review. *Vavra v. Honeywell

Int'l, Inc.*, 106 F.4th 702, 706 (7th Cir. 2024) (explaining that any inference of causation

supported by temporal proximity may be negated by circumstances providing an

alternative explanation for the challenged action); *Jokich*, 42 F.4th at 634 (same).

Dr. Lin also complains that Dr. Wickert's involvement in the MEC's review process was retaliation for his complaints of discrimination. Dr. Lin's response brief in opposition to summary judgment states "Wickert also continued to be involved in these peer review processes concerning Lin as a member of the MEC after Lin complained about him." [DE 119 at 21]. However, Dr. Wickert was already involved in reviewing Dr. Lin's conduct and was simply doing the same thing he had already been doing before Lin complained. This is not evidence of retaliation. *Johnson*, 260 F.3d at 735; *Wright v. New York City Off-Track Betting Corp.*, 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008) ("If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory.").

Considering the record in this case, there isn't enough evidence for a reasonable jury to determine that Dr. Lin has suffered retaliation under Title VII. Dr. Lin's retaliation claim is a closer call than his other claims. But in the end, he has to produce sufficient "evidence on which the jury could reasonably find for him" on that claim. *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). And in my judgment, he has not done so.

### D. State Law Claims

Dr. Lin has also raised several claims based on Indiana law – specifically sham process (Count III); breach of fiduciary duty (Count IV); breach of contract (Count V) breach of duty of good faith and fair dealing (Count VI); tortious interference with the

33

contractual and business relationships he had with his patients (Count VII); and concerted action (Count VIII). Franciscan argues that it is entitled to summary judgment on each of Dr. Lin's state law claims. However, because the Court has granted summary judgment in favor of Franciscan on all of plaintiff's federal claims, for which the Court has federal subject matter jurisdiction, the "general rule" is that this Court should relinquish jurisdiction over the state law claims, because they are no longer supplemental to the related federal claims. *Hahn v. Macklin*, 2002 WL 243642, at *9 (S.D. Ind. Jan. 4, 2002) ("When the court grants summary judgment on all federal claims before trial, the general rule is that the court should relinquish supplemental jurisdiction over state law claims."). However, before supplemental jurisdiction over the state law claims are relinquished, federal courts consider "judicial economy, convenience, fairness, and comity." *Mercado v. Columbus Reg'l Hosp.*, 2022 WL 17268312, at *14 (S.D. Ind. Nov. 28, 2022).

More specifically, I need to be convinced that none of the "three well recognized" exceptions to the rule that the remaining state law claims should be handled by the state court are present. These three exceptions are (1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) when substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; and (3) when it is absolutely clear how the pendent claims can be decided. *Dupont Hosp., LLC v. Myers*, 2019 WL

3317327, at *1 (N.D. Ind. July 22, 2019) (citing *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251-52 (7th Cir. 1994)).

Because Lin brought his bevy of state claims in federal court under supplemental jurisdiction, the period of limitations for his state law claims was tolled. *See*, 28 U.S.C. 1367(d); *White v. Loc. Union No. 1111, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 2005 WL 280349, at *13 (S.D. Ind. Jan. 20, 2005) (explaining that the state statute of limitations for a state law claim asserted under supplemental jurisdiction shall be tolled while the claim is pending in federal court); *Artis v. D.C.*, 583 U.S. 71, 76 (2018) (explaining that § 1367(d) supplies "a tolling rule that must be applied by state courts"). And while I am convinced that no reasonable jury could determine that Dr. Lin has suffered a violation of Title VII, I am not convinced that it is so clear how Dr. Lin's state law claims should be decided. (The briefing provided by the parties relating to the six state law claims was pretty limited). Because there are no longer any Title VII claims in the case providing federal jurisdiction, I will relinquish jurisdiction over the state law claims.

**ACCORDINGLY**:

Franciscan's Motion for Summary Judgment [DE 82] is **GRANTED**. Summary Judgment is **GRANTED** in favor of Franciscan on Counts I and II (Dr. Lin's Title VII claims). With the elimination of all federal claims from the case, Dr. Lin's state law claims asserted in Counts III, IV, V, VI, VII, and VIII are **DISMISSED WITHOUT**

**PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3) and (d). The Clerk is **INSTRUCTED** to **CLOSE THIS CASE**.

       **SO ORDERED**.

       ENTERED: June 20, 2025.

                          /s/ Philip P. Simon
                          PHILIP P. SIMON, JUDGE
                          UNITED STATES DISTRICT COURT